**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

EDITH M. RIPPLE-WHARY,          :

                **Plaintiff**          :          **CIVIL ACTION NO. 3:05-2034**

        **v.**          :          **(CONABOY, D.J.)**
                                    **(MANNION, M.J.)**
JO ANNE B. BARNHART,          :
Commissioner of Social
Security,          :

              **Defendant**          :

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. § 405(g) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), respectively. 42 U.S.C. §§ 401-433, 1381-1383f.

## I. Procedural Background

The plaintiff protectively filed applications for DIB and SSI on February 28, 2003, alleging disability since January 15, 2003 due to a right shoulder injury, carpal tunnel syndrome, TMJ, and back problems. (TR. 201-03, 229, 515-17). The state agency denied the plaintiff's applications initially and the plaintiff requested a hearing. (TR. 156).

A hearing was held before an administrative law judge ("ALJ") on February 9, 2004. (TR. 37-84). The plaintiff, who was not represented by an attorney, and a vocational expert ("VE") testified. *Id*. The ALJ issued an unfavorable decision, and the plaintiff requested review from the Appeals Council. (TR. 146-55, 187-91). On April 28, 2004, the Appeals Council remanded the case to the ALJ and ordered the ALJ to obtain additional evidence of the plaintiff's asthma and testimony from a VE to clarify the effect of the plaintiff's limitations on the occupational base. (TR. 195).

A second hearing was held before the same ALJ on November 8, 2004. (TR. 26). The plaintiff, this time represented by an attorney, a medical expert ("ME"), and a VE testified. (TR. 85-139).[1] On November 23, 2004, the ALJ issued an unfavorable decision. (TR. 17-25).

The plaintiff requested review of the ALJ's decision and on August 5, 2005, the Appeals Council denied the request for review. (TR. 9-11, 13). Thus, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. § 405(g). Currently pending is the plaintiff's appeal, filed on October 5, 2005, of the Commissioner's decision. (Doc. No. 1).

---

[1]

The plaintiff also filed new applications for DIB and SSI on April 5, 2004, pending Appeals Council review of the first hearing decision. (TR. 17). These applications were denied initially and the plaintiff requested a hearing on July 23, 2004. (TR. 17). The record contained no further procedural information regarding these applications; the November 4, 2004 hearing was scheduled as a supplemental hearing pursuant to the Appeals Council's April 28, 2004 remand order. (TR. 26-30, 88).

## II. Disability Determination Process

A five-step process is required to determine if an applicant is disabled under the Act.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work, and; (5) whether the applicant's impairment prevents the applicant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.

The instant decision was ultimately decided at the fifth step of the process, when the ALJ concluded that the plaintiff was not disabled because she could perform work existing in substantial numbers in the national economy.  (TR. 25).

## III.  The ALJ's decision

Using the above-outlined procedure, the ALJ found that (1) the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; (2) the plaintiff's degenerative disc disease and spondylosis of the cervical and lumbar spine, history of carpal tunnel and right shoulder surgery, asthma, and arthritis of the knee were "severe" under 20 C.F.R. §§ 404.1520(c), 416.920(c), but (3) did not meet or medically equal one of the

3

listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the plaintiff could not perform her past relevant work; but (5) could perform work in other occupations existing in the national economy, such as a video monitor, ticket taker, and telephone receptionist.  (TR. 18-25).

The ALJ determined that the plaintiff retained the residual functional capacity ("RFC") for sedentary exertional work but needed to avoid exposure to concentrated amounts of dust, fumes, and other respiratory irritants.  (TR. 24).  The ALJ found that the plaintiff had the residual functional capacity ("RFC") to lift and carry ten pounds occasionally and five pounds frequently and to sit, stand, and walk eight hours in an eight-hour day, provided she had a sit/stand option.  *Id*.  The ALJ also found the plaintiff not credible regarding her alleged pain and limitations.  (TR. 22).


## IV.  Evidence of Record

The plaintiff was forty-four-years-old, a "younger" individual under the Act, at the time of the ALJ's November 23, 2004 decision.  (TR. 18).  20 C.F.R. §§ 404.1563, 416.963.  She has fourteen years of education, including high school and two years of college.  (TR. 46-47).  The plaintiff has past relevant work experience as a home maintenance worker.  (TR. 133).

A.  The plaintiff's right rotator cuff injury.

The plaintiff alleged disability since January 15, 2003, the date she stopped working.  (TR. 147, 229).  She reported that she became unable to

work due to a right arm injury.  (TR. 229).  On January 14, 2003, the plaintiff fell on the ice and later reported pain and limited range of motion in her right shoulder, and tingling down her right arm.  (TR. 169, 280).  A February 21, 2002 MRI showed a full thickness tear of the plaintiff's right rotator cuff and a small to moderate effusion.  (TR. 168).  Daniel Feldmann, M.D., an orthopedic surgeon, diagnosed right shoulder impingement, AC (acromioclavicular) joint degenerative joint disease, and a rotator cuff tear. (TR. 170).  Dr. Feldmann performed surgery to repair the impingement and tear in March 2003.  (TR. 170, 306-07, 330-32).

One week after the surgery, Dr. Feldmann reported that the plaintiff was doing well and had full range of motion at the elbow and wrist.  Dr. Feldmann prescribed physical therapy.  (TR. 304).  Dr. Feldmann reported in May, June, and August of 2003 that the plaintiff was improving, and by August 21, 2003, Dr. Feldmann reported that the plaintiff had full range of motion, normal resistive strength, and negative impingement findings.  (TR. 327-29).  Dr. Feldmann administered an injection to address the plaintiff's biceps tendinitis and recommended she continue her exercises and return in several months. (TR. 327).

Prior to the plaintiff's surgery, Dr. Feldmann noted that the plaintiff was a self-employed housekeeper.  (TR. 335).  Dr. Feldmann recommended the

5

plaintiff work only part-time, as she was finding it difficult to work full hours with her right shoulder pain.  *Id*.  Dr. Feldman recommended twenty hours per week of light-duty work.  *Id*.

C.  The plaintiff's TMJ.

The plaintiff also alleged disability due to TMJ (temporomandibular joint) disorder, which stemmed from a 1989 car accident in which the plaintiff's face hit the steering wheel.  (TR. 229, 269). A June 2002 MRI of the plaintiff's TMJ showed no meniscal displacement, joint effusion, periarticular TMJ inflammatory changes, or edema.  (TR. 267).  In November 2002, Anil Patil, M.D., noted that although her MRIs were negative, the plaintiff still wore a separator and reported having spasms.  (TR. 271).

Due to increased complaints of jaw and knee pain in February 2004, John P. Pagana, M.D., the plaintiff's family practitioner, recommended that the plaintiff increase her pain medication while she was visiting her daughter in Italy.  (TR. 439).  In October 2004, Reynold M. Crane, D.D.S., recommended that the plaintiff be evaluated by a neurologist for a neurological origin to her pain in light of her jaw complaints and normal MRI. (TR. 493, 503).  His examination was remarkable only for a marked muscle tenderness to all her muscles of mastication.  (TR. 493).  The plaintiff testified

6

that she had gained nearly twenty pounds in the previous year.  (TR. 73).

She testified that she took her medications before eating, but did not mention

pain while eating.  (TR. 72-73).

B.  The plaintiff's cervical and lumbar impairments.

The plaintiff alleged disability due to degenerative disc disease of the

cervical and lumbar spine, which she also traces to the 1989 car accident.

(TR. 229, 271).  A 1990 MRI showed degenerative disc disease at C5-6 with

a bulge at C5-6 and C6-7, cervical spondylosis, and neural foraminal

narrowing at the C5-6 level.  (TR. 271).  Similarly, a February 20, 2002

cervical MRI showed mild degenerative disc disease at C5-6 with bilateral

neural foraminal narrowing and no evidence of cervical cord compression.

(TR. 295).  In November 2002, the plaintiff complained of tightness in her

neck and stated it was reduced with moist heat, rest, massage, and

acupuncture.  *Id*.  An April 2003 cervical spine MRI showed a Chiari I

malformation[2], mild left sided C3-4 through C6-7 foraminal stenosis,

---

[2]

A Chiari I malformation "occurs during fetal development and is characterized by downward displacement by more than four millimeters, of the cerebellar tonsils beneath the foramen magnum into the cervical spinal canal."  Many people with Chiari I malformation have no symptoms, although some may have severe head and neck pain, headaches, loss of pain and temperature sensation of the upper torso and arms, loss of muscle strength in the hands and arms, dizziness and balance problems.  Chiari Malformation, at N e u r o s u r g e r y   T o d a y ,   M a r c h   2 0 0 6 ,   *a t* http://www.neurosurgerytoday.org/what/patient_e/chiari1.asp

anterolistheisis (slippage) of C7 under C6 with angular lordosis, and small bulges at C5-6 and C6-7.  (TR. 177-78, 337-38).

The plaintiff also complained of tightness in her low back that increased with activity but decreased with massage.  *Id*.  A February 2002 MRI of the lumbar spine revealed no evidence of disc herniation but low grade central lumbar stenosis at L3-4 and posterior annular tear to the L3-4 and L4-5 disc. *Id*.  The physician who interpreted the MRI reported that there was no lumbar radiculopathy.  *Id*.

In June 2003, Dr. Pagana described the plaintiff's spinal disorder as "pain with motion" in her cervical and lumbar spine.  (TR. 314).  Dr. Pagana reported that sitting straight leg raising tests were negative and that the plaintiff had 4/5 motor power, noting that she was "weak but not severely weak."  *Id*.  Dr. Pagana noted that the plaintiff's treatment for her cervical and lumbar pain was pain medication.  *Id*.

A September 2003 lumbar spine MRI showed small disc protrusions at L3-4 and L5-S1, but no significant canal narrowing.  (TR. 176, 360).  An October 2003 x-ray of the plaintiff's lumbar spine showed moderately severe narrowing of the L2-3 and L3-4 disc spaces, but was otherwise unremarkable. (TR. 175).  W. Fred Hess, M.D., diagnosed lumbar spondylosis and noted that the plaintiff's pain appeared "mechanical in nature and related to degenerative

disc disease." Dr. Hess noted that the plaintiff would start a back extension and strengthening exercise program and recommended she return in six to eight months. (TR. 180).

When the plaintiff returned to Dr. Hess in April 2004, he recommended she continue with conservative treatment, including pain medications and exercises, and told her that he "really d[id]n't see anything at th[at] point in time that [he] consider[ed] surgical." (TR. 451-52). Physical examination revealed some diffuse tenderness throughout the trapezial area into the lumbar spine but negative sciatic notch tenderness, negative root tension signs, normal gait, and no focal motor deficits. (TR. 451).

Physical therapy records from November and December 2003 reveal that the plaintiff cooked Thanksgiving dinner for ten people, including all of the cooking and cleaning; cleaned her house; and was able to shovel a little snow. (TR. 377-79). The plaintiff complained of low back and thoracic pain on one occasion after doing a lot of walking, getting groceries, and lifting bags. (TR. 378). The plaintiff reported in January 2004 that her low back was stronger and she had increased endurance since starting swimming. (TR. 377). The plaintiff stopped going to physical therapy that same month for insurance reasons. *Id*.

Physical therapy records from earlier in 2003 also reveal that the plaintiff

performed a variety of daily activities.  The plaintiff reported "doing a lot of work lifting wood and other activities at home" in July 2003, cleaning out cupboards and mowing grass with a riding mower in June 2003; and "doing a lot of cleaning" and "making a lot of macaroni salad" in May 2003.  (TR. 388, 389, 392-93).

D.  The plaintiff's carpal tunnel syndrome.

An EMG performed in December 2002 to evaluate the plaintiff's hand complaints revealed moderately severe right carpal tunnel syndrome and left ulnar nerve neuropraxia across the elbow.  (TR. 274, 384-85).  David C. Bush, M.D., performed a right carpal tunnel release in April 2003.  (TR. 299-300). At a follow-up visit five days later, Dr. Bush noted that the plaintiff was "doing well."  (TR. 297). Dr. Bush performed a left carpal and cubital tunnel release in September 2003.  (TR. 171-72, 347-48).  At a follow-up visit with Dr. Bush in November 2003, the plaintiff indicated that she was "extremely pleased" with the outcome of her surgery.  (TR. 407).  Dr. Bush noted that she would be sent for work hardening and physical therapy.  *Id.*

By August 2004, Sanjiv Naidu, M.D., noted that the plaintiff still complained of a "certain amount of weakness in her left arm." (TR. 485).  The plaintiff was sent to Dr. Naidu after she reported dropped things and having diffuse forearm pain.  *Id*.  The plaintiff reported that Dr. Bush had told her the

problem was cervical in nature, rather than related to carpal tunnel syndrome. *Id*. Dr. Naidu noted that the plaintiff's left ulnar nerve was stable and her paresthesias appeared to be resolved. *Id*. The plaintiff had only mild tenderness over the superficial branch of the radial nerve and full cervical range of motion. (TR. 485). Dr. Naidu noted that there was "really no need for further surgical treatment" and recommended only exercises. *Id*.

In February 1, 2005, because the plaintiff continued to complain of numbness and paresthesias in her upper extremities, Dr. Pagana referred the plaintiff to Mark A. Blakeslee, D.O., for a nerve conduction study in her upper extremities. (TR. 535, 542). Dr. Blakeslee's resulting report noted that the EMG and nerve conduction study was abnormal, and was "compatible with the presence of moderate severity median mononeuropathy" but showed no evidence of radiculopathy, myopathy, or an ulnar palsy. (TR. 535). In July 2005, Dr. Blakeslee reported to Dr. Pagan that the plaintiff had severe bilateral carpal tunnel syndrome (TR. 528).

E.  The plaintiff's asthma and vision problems.

The Appeals Council remand order instructed the ALJ to obtain additional evidence regarding the plaintiff's asthma. (TR. 193-96). The plaintiff has been diagnosed with and takes medication for asthma. (TR. 255, 425). The Appeals Council specifically noted that the record had contained

11

insufficient pulmonary function evidence.   (TR. 194).   In April 2004, a methacholine challenge test confirmed the asthma diagnosis.   (TR. 428). April 2004 and August 2004 baseline pulmonary function tests were normal. (TR. 428, 488).

In an August 2003 letter, Sheldon J. Kaplan, M.D., a specialist in retina and vitreal diseases, indicated that the plaintiff had a history of a repaired retinal detachment in the left eye and laser treatment for lattice degeneration in the right eye.  (TR. 167, 341).  He further indicated that her corrected vision was 20/25 in the right eye and 20/60 in the left eye.  (TR. 167).  Dr. Kaplan reported that the plaintiff complained of lost words when reading, a very large floater, and sparkles around traffic lights.  (TR. 167).  Dr. Kaplan attributed the plaintiff's inability to read for extended periods of time to distorted blank spots in her vision from some early posterior subcapsular cataracts and scarring. *Id*.  He stated that the plaintiff's contacts and reading glasses make her vision better, but not good enough to read for long periods of time.  *Id*.

F.  Medical opinions.

In June 2003, John P. Pagana, M.D., the plaintiff's family practitioner, indicated that the plaintiff could perform most daily activities, but had to modify them due to pain.  (TR. 314).  His examination revealed slightly decreased strength (4/5), and a decreased range of motion, but normal

reflexes.  (TR. 314- 15).  Dr. Pagana denied that the plaintiff used an assistive device for ambulation, even for special situations.[3]  (TR. 315).

In September 2003, Dr. Pagana completed a form for purposes of entitling the plaintiff to welfare benefits.  Dr. Pagan opined that the plaintiff was "temporarily disabled– less than twelve months" from September 30, 2003, through March 30, 2004, due to discogenic disease and carpal tunnel syndrome.  (TR. 174, 343).

Mohammed Samad, M.D., a state agency physician, examined the plaintiff in June 2004.  (TR. 461-62).  The plaintiff reported that she was unable to walk a block, sit for one-half hour or lift more than three pounds. (TR. 461).  A physical examination revealed that she had restricted range of motion of the neck, knees, right shoulder, and lumbosacral spine.  (TR. 463). Inexplicably, Dr. Samad indicated in one portion of his report that the plaintiff had 3/5 strength in both hands, but stated she has 0/5 strength in both hands in another portion of that same report, in fact, in the same paragraph.  (TR. 463).  Dr. Samad completed a medical source statement indicating that the plaintiff could only lift two to three pounds occasionally; stand and walk an hour or less; and sit less than six hours.  (TR. 465-66).

---

[3]

 Notably, despite Dr. Pagana's assurance that the plaintiff never required an assistive device for walking, the plaintiff used a cane at the hearing.  (TR. 18).

G.  The plaintiff's right knee injury.

The plaintiff injured her knee two months before the second hearing when she tripped and fell on September 5, 2004.  (TR. 85, 496).  September 2004 x-rays of the plaintiff's knee were negative.  (TR. 502).  An MRI of the knee showed no significant change within the substance of the lateral meniscus, intra-articular effusion, no chondral effect, and no loose bodies. (TR. 495).  In October 2004, Dr. Pagana injected the plaintiff's knee with Kenalog and Lidocain and instructed her on "icing and activity modification." (TR. 495).  He noted that the plaintiff should return in four weeks for a follow-up and determine whether arthroscopy would be needed.  (TR. 495).  The plaintiff submitted no further relevant medical records to the Appeals Council, although the plaintiff submitted other medical records covering the period from August 2004 to July 2005.  (TR. 528-59).

H.  Hearing testimony.

At the February 2004 hearing, the plaintiff testified that she lives in a home with her eleven year-old daughter and two boarders.  (TR. 45-46, 64-65). She testified that she drives locally, including to the YMCA three times per week to swim.  (TR. 46, 61, 64).  The plaintiff testified that she shops for groceries several times per week because she cannot carry everything at once.  (TR. 64).  She cooks meals for herself and her daughter.  (TR. 69).

The plaintiff denied being able to lift any more than ten pounds.  (TR. 68). She is a leader of a girl scout troop and attends weekly meetings.  (TR. 74).

At the second hearing in November 2004, the plaintiff was represented by counsel.  (TR. 85-139).  She testified that was still involved with the Girl Scouts and was an assistant leader for a troop.  (TR. 124).  The plaintiff also testified that her twelve year-old daughter is very self-sufficient, including making her own lunch and getting ready for school.  (TR. 122).  She states that her daughter does the laundry and the cleaning and is learning how to cook.  (TR. 131).  The plaintiff testified that she takes her daughter grocery shopping and her daughter will help her carry the bags.  (TR. 132).

A VE also testified.  (TR. 133-38).  The ALJ asked the VE to consider the plaintiff's age, education, and work experience, as well as the fact that she was limited to sedentary work with a sit/stand option.  (TR. 134). The ALJ also asked the VE to consider that Plaintiff would require a work environment in which she would not be exposed to excess dust, fumes, odors, gases or any type of pollutants.  *Id*.  The ALJ also added that Plaintiff had visual impairments that would not require any greater degree of visual acuity than is needed to drive.  (TR. 134-35). Based upon these hypothetical restrictions, the VE identified sedentary unskilled positions of video monitor, ticket taker, and telephone receptionist.  (TR. 135).

A medical expert, John Tansey, M.D., testified at the second hearing. (TR. 90). Dr. Tansey indicated that the plaintiff's MRI findings of degenerative disc disease were not significant but were, instead, normal for someone forty-five to fifty years old. (TR. 93). Dr. Tansey also testified, regarding the plaintiff's carpal tunnel release, that the median nerve was not involved in grasping. He stated that the plaintiff's carpal tunnel problems had been sensory rather than muscular, i.e., pain and numbness rather than grasping. (TR. 105-07).

Based on his review of the medical evidence of record, Dr. Tansey opined that the plaintiff retained the ability to perform sedentary work with a sit/stand option, including lifting up to ten pounds, sitting at least six hours, pushing/pulling ten pounds, climbing ramps and stairs, but should avoid moderate exposure to fumes, odors, dust, and gases. (TR. 95-99).

## V.  Discussion

The plaintiff contends that the ALJ (1) asked her questions that were prejudicial, biased, or irrelevant; (2) mischaracterized the record; (3) erred in not giving controlling weight to the opinion of the agency physician; (4) and finding her not credible.

A.  Standard of Review.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For

> purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

> B.  Whether the ALJ asked the plaintiff questions that were prejudicial, biased, or irrelevant.

The plaintiff argues that the ALJ's questions at the February 2004 (first) hearing were prejudicial, biased, irrelevant, and sexist.  (Doc. No. 8-9).  The questions of which the plaintiff complains were with regard to her daughter, first marriage, vocational training, work demands, and her interactions with her boarders.  (TR. 45, 47-51, 70).  The questions to which the plaintiff refers, however, were the sort of routine questions the ALJ must ask to determine the plaintiff's daily activities, education, and work history.  (TR. 46-48).  The plaintiff was not represented by counsel at the hearing, thus conferring on the ALJ a duty to take a more active role in fully developing the record.  *See Hess,* 497 F.2d at 840-841.

All of the ALJ's questions were relevant.  The ALJ's questions about whether the plaintiff received financial assistance to raise her daughter were not irrelevant; they were meant to develop the record with respect to the plaintiff's work history and earnings, relevant to the sequential determination process and to the plaintiff's eligibility for SSI payments.  42 U.S.C. § 1382(a).

18

20 C.F.R. §§ 404.1520(a)(4)(I), 404.920(a)(4)(I), 404.1560(b)(2), 416.960(b)(2). The ALJ's questions about whether the plaintiff cooked for her boarders was not irrelevant and sexist, as the plaintiff contends, but was meant to determine the extent of her daily activities and physical limitations, information that is relevant to the disability determination. 20 C.F.R. §§ 220.45, 220.114, 220.129, 404.1512, 404.1529, 416.912, 416.929. Similarly, although the plaintiff contends that the ALJ's question regarding whether the plaintiff had any vocational training, such as nursing or beauty school, was not sexist and prejudicial, but was meant to develop the record regarding the plaintiff's work history and education background, factors relevant to the disability determination. 20 C.F.R. §§ 404.1512, 404.1564, 416.912, 416.964. With no attorney to elicit such information from the plaintiff, the ALJ was obligated to ask such questions himself. (TR. 47-48). *Hess,* 497 F.2d at 840-841. Finally, the ALJ's question about whether the plaintiff ate and the plaintiff's weight gain did not reveal a bias, as the plaintiff argues, but were relevant to the plaintiff's claim of disability due to TMJ, a disorder causing jaw pain. (TR. 72-73).

We do not take lightly the plaintiff's claim that the ALJ was biased. "The right to an unbiased ALJ is particularly important because of the active role played by ALJs in social security cases. *Ventura v. Shalala*, 55 F.3d 900, 902

19

(3d. Cir. 1995).  Here, however, we have examined the record and do not find the plaintiff's allegations of bias on the part of the ALJ to be substantiated. (TR. 45-73).   When a claimant is unrepresented at a hearing, as in the present case, the ALJ has "must secure relevant information regarding [that] claimant's entitlement to social security benefits."  Hess, 497 F.2d at 841. That is precisely what the ALJ did here.

Moreover, the plaintiff did not object to any of the ALJ's questions or let on her discomfort with them during the hearing.  *Ventura*, 55 F.3d at 902 (pointing out that the claimant has duty to bring objections to the ALJ's attention).  A claimant must bring any objections to the attention of the ALJ, and the ALJ shall decide whether to continue the hearing or withdraw.  20 C.F.R. §§ 404.940, 416.1440.

C.  Whether the ALJ  misrepresented evidence in the record.

The plaintiff argues that the ALJ misrepresented the medical evidence and made impermissible lay medical judgments.  First, the plaintiff contends that the ALJ misrepresented the record regarding the duration of the plaintiff's impairments.  (Doc. No 7 at 10).  The plaintiff contends that the ALJ erred in stating that her carpal tunnel syndrome, rotator cuff injury, and right knee injury were of less than the twelve month duration required for social security benefits.  20 C.F.R. §§ 404.1505(a), 416.905(a) (stating that an impairment

must be disabling for at least twelve continuous months).

We agree with the plaintiff on only one of these three, the duration of the plaintiff's carpal tunnel syndrome.  The plaintiff had carpal tunnel surgery and cubital tunnel release on her left hand in September 2003, and by the following August 2004, Dr. Naidu noted that the plaintiff's ulnar nerve was stable and her paresthesias was resolved.   The plaintiff had only mild tenderness over the superficial branch of the radial nerve.  (TR. 485).  While the plaintiff reported weakness and diffuse pain in her left arm, Dr. Naidu noted that there was "really no need for further surgical treatment" and recommended only exercises. *Id*.

The plaintiff cites Dr. Blakeslee's February 1, 2005 nerve conduction report as evidence that her carpal tunnel syndrome persisted.  Dr. Blakeslee reported that the EMG and nerve conduction study was "compatible with the presence of moderate severity median mononeuropathy" but showed no evidence of radiculopathy, myopathy, or an ulnar palsy.  (Doc. No. 7 at 10; TR. 535).  The bilateral median mononeuropathy, however, signaled carpal tunnel syndrome.   What is distal medial nerve dysfunction? http://neurology.health-cares.net/distal-median-nerve-dysfunction.php. (TR. 535, 543).   In fact, Dr. Blakeslee later diagnosed severe carpal tunnel syndrome.  (TR. 528).  This evidence was not included, however, in the

original hearing record and so cannot be considered pursuant to a substantial evidence review. *Matthews v. Apfel*, 239 F.3d 589, 594-95 (3d Cir. 2001). The evidence was presented only to the Appeals Council, which denied review. (TR. 9-12, 533).

Thus, as far as the evidence available to the ALJ was concerned, there is substantial evidence supporting the ALJ's conclusion that the plaintiff's carpal tunnel syndrome was of less than twelve months duration. As for the evidence presented to the Appeals Council, remand is not warranted.

*Matthews* held that such evidence warranted remand only when it is new and material, and there was good cause why it was not previously presented to the ALJ. 239 F.3d at 593. Dr. Blakeslee's report and treatment noted from January 17, 2005 to February 1, 2005 are new and there was good cause for why it was not presented to the ALJ; it post-dated the hearing. (TR. 534). The evidence is not, however, material. Evidence that the plaintiff's carpal tunnel syndrome was not resolved by the September 2003 surgery could not reasonably be expected to have changed the outcome of the ALJ's decision. *Szuback v. Sec'y of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). This is because the ALJ determined that the plaintiff's carpal tunnel syndrome would not interfere with her ability to perform sedentary work, the only type of work of which the ALJ found her capable.

(TR. 21).   The ALJ asked the ME whether the plaintiff's hands would be affected by sedentary work where the plaintiff would not lift over ten pounds, to which Dr. Tansey responded that he saw nothing wrong with that.   (TR. 109).   In his decision, the ALJ found that the plaintiff had the RFC for sedentary work, and cited Dr. Tansey's testimony that the plaintiff's carpal tunnel syndrome would not interfere with that ability.[4]   (TR. 21).

The ALJ did not err in finding that the plaintiff's rotator cuff injury was of disabling severity for less than twelve months.   The injury was discovered in February 2002, repaired by surgery in March 2002, and by August of 2003 the plaintiff had full range of motion, normal resistive strength, and negative impingement findings.   (TR. 168, 170, 306-07, 330-32, 327-29).

The plaintiff also argues that the ALJ erred in finding that her right knee injury would resolve in twelve months.   (Doc. No. 7 at 10; TR. 21).   Indeed, the ALJ's prospective finding that the injury would resolve itself in twelve months was pure guesswork; by the time of the hearing, only two months had

---

[4]

It is worth noting that the Commissioner's brief did not address the issue of whether the ALJ erred in finding that the plaintiff's carpal tunnel syndrome resolved itself in less than twelve months.   This is a significant omission; the Appeals Council remand order had in fact instructed the ALJ to determine whether any RFC limitations resulted from the plaintiff's carpal tunnel syndrome.   (TR. 195).   We could assume, then, that the Commissioner conceded this issue.   Nevertheless, the new evidence did not meet the Matthews test for remand.

passed since the plaintiff injured her knee.[5]  This error on the ALJ's part is irrelevant for our purposes, however; the plaintiff cannot claim disability from a prospective potential impairment.  Although an impairment can be disabling if it is expected to last for a continuous period of twelve months, it is the plaintiff's burden to show that.  20 C.F.R. §§ 404.1505(a), 416.905(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).

Here, the plaintiff presented no further evidence to the Appeals Council of her knee injury.  (TR. 528-29).  In October 2004, Dr. Pagana told the plaintiff to return in four weeks for a follow-up.  (TR. 495).  Yet the plaintiff submitted no further relevant medical records to the Appeals Council, even though the plaintiff submitted other post-hearing medical records.  (TR. 528-59).  Thus, the plaintiff did not fulfill her burden of showing that her knee injury was "expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.1505(a), 416.905(a).

The plaintiff next argues that the ALJ erred in finding that no loss of pulmonary function had been established with respect to the plaintiff's asthma.  While it is true, as the plaintiff repeatedly states, that the ALJ is not a physician, the ALJ's role is as fact-finder.  Here, substantial evidence

---

[5]

The plaintiff's right knee injury took place on September 5, 2004; the hearing was on November 8, 2004.  (TR. 85, 496).

supports this factual finding.  (TR. 21).  April 2004 and August 2004 baseline pulmonary function tests were normal.  (TR. 428, 488).

   D.  Whether the ALJ  erred in not giving controlling weight to the opinion of the agency physician.

The plaintiff contends that the ALJ erred in not giving dispositive weight to Dr. Samad's RFC assessment.  (Doc. No. 7 at 10; TR. 22).  The plaintiff asserts that Dr. Samad's opinion was supported by the February 2002 cervical and lumbar MRI reports and the April 2003 cervical spine MRI report. (TR. 295-96, 337-38).  The 2002 cervical MRI showed mild degenerative disc disease at C5-6 with bilateral neural foraminal narrowing and no evidence of cervical cord compression.  (TR. 295).  The 2002 lumbar MRI showed only low grade central lumbar stenosis at L3-4 and posterior annular tear to the L3-4 and L4-5 disc with no evidence of disc herniation or lumbar radiculopathy. (TR. 337-38).

We think a reasonable person could conclude that these MRI reports did not substantiate, as the plaintiff asserts, Dr. Samad's opinion that the plaintiff could lift two to three pounds; stand and walk less than an hour; and sit less than six hours.  (TR. 465).  To be entitled to controlling weight a physician's opinion must be consistent with the other evidence of record and well-supported with examination findings and diagnostic studies. 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4).  Dr. Samad's RFC opinion is not well-

supported either by his own singular examination or by the other evidence of record.  Yet Dr. Samad's examination findings with regard to the plaintiff's strength were internally inconsistent: Dr. Samad indicated in the same report that the plaintiff's hand strength was 3/5 bilaterally and 0/5 bilaterally.  (TR. 463).  In addition, as the ALJ pointed out, Dr. Samad's findings of weakness were inconsistent with the evidence from the plaintiff's own treating physicians, Drs. Naidu and Bush.  (TR. 21, 445, 485, 492).

Furthermore, Dr. Samad opined that the plaintiff was significantly more limited in her functioning than any of her own physicians indicated.  In fact, the only opinions of disability the plaintiff provided in support of her claim consisted of opinions that would not satisfy the standard of the Act.  Dr. Pagana's opinion that the plaintiff was "temporarily disabled" for six months ending in March 2004 does not satisfy the durational requirement of the Act.  (TR. 174, 343).  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) (setting out the twelve month duration requirement).  Likewise, Dr.  Feldmann's opinion that the plaintiff could only perform her past work as a housekeeper part-time until her shoulder problems were corrected does not suggest that she is incapable of performing all work, only her past work.  (TR. 335).  Significantly, Dr. Feldmann did not offer another opinion of disability after the plaintiff's shoulder surgery.  Finally, as the ALJ also pointed out, Dr. Samad's

restrictions appear to be based on the plaintiff's subjective complaints.  (TR. 22).   Thus, we conclude that substantial evidence supports the ALJ's determination that Dr. Samad's opinion was not due controlling weight.

E.  Whether the ALJ disregarded the Appeals Council order.

The plaintiff contends that the ALJ disregarded the order of the Appeals Council to further consider the asthma and vision problems alleged by the plaintiff.  (Doc. No. 7 at 15).  The plaintiff's argument has no merit.  The ALJ considered both of these impairments; included them in his hypothetical question to the VE; discussed the relevant evidence in his decision; and made findings with respect to both.  (TR. 18-19, 21, 22, 24).  The ALJ asked the VE to consider that any jobs identified not require any greater degree of visual acuity than needed for driving.  (TR. 134-35).  The VE responded that the plaintiff could still perform work as a video monitor, ticket taker, and telephone receptionist.  (TR. 135).  Likewise, the ALJ ultimately found the plaintiff's asthma to not be disabling but included restrictions from environmental irritants that might trigger it, such as, dust, fumes, odors, gases, or other pollutants.  (TR. 24, 135). ___

F.  Whether the ALJ erred in relying on ME testimony.

Lastly, the plaintiff lists a number of purported errors committed by Dr.

27

Tansey, the ME who testified at the hearing.  (Doc. No. 7 at 11-14; 15-16). The plaintiff argues that Dr. Tansey was not an expert in all the areas of medicine relevant to her case, including ophthalmology, pulmonology, pharmacology, and neurology, and was not intimately familiar with her case. (Doc. No. 7 at 15).

As the Commissioner points out, it would be nearly impossible to find a medical expert who is a specialist in all areas of medicine and impractical to hire numerous experts for one disability claim.  Moreover, the plaintiff's very argument ignores a basic tenant of disability claims: that it is the plaintiff's burden to present evidence supporting her claim for disability.  20 C.F.R. §§ 404.1512, 416.912; *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).   The Commissioner has no burden, as the plaintiff's argument implies, to make a showing of "non-disability." *Capoferri v. Harris*, 501 F. Supp. 32, 36 (E.D. Pa. 1980), aff'd 649 F.2d 858 (3d Cir. 1981).

## VI.    RECOMMENDATION

Based on the foregoing, it is recommended that the plaintiff's appeal

from the decision of the Commissioner of Social Security be **DENIED**.


S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Dated:**   October 12, 2006

O:\shared\REPORTS\2005 Reports\05-2034.01.wpd