UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDITH M. RIPPLE-WHARY,          :
                                :CIVIL ACTION NO. 3:05-CV-2034
          Plaintiff,            :
                                :(JUDGE CONABOY)
          v.                    :(Magistrate Judge Mannion)
                                :
MICHAEL ASTRUE, Commissioner    :
of Social Security,             :
                                :
          Defendant.            :
                                :
_____

**MEMORANDUM**

     In this Memorandum we consider Magistrate Judge Malachy E.
Mannion's Report and Recommendation (Doc. 9) regarding Plaintiff's
appeal of the denial of her claim for Disability Insurance Benefits
("DIB") and Supplemental Security Income ("SSI") under Titles II
and XVI of the Social Security Act ("Act") respectively, 42 U.S.C.
§§ 401-433, 1381-1383(f).  The Magistrate Judge recommends that
Plaintiff's Appeal be denied.  (Doc. 9 at 29.)  Because Plaintiff
has filed objections to the recommended disposition, (Doc. 10), we
will make a *de novo* determination regarding the matters to which
Plaintiff has objected.  *See* 28 U.S.C. § 636(b)(1)(C).

     After a thorough examination of the record, for the reasons
discussed below we conclude the Magistrate Judge properly
determined that the ALJ's decision was based on substantial
evidence.  Therefore, we adopt the Magistrate Judge's Report and
Recommendation (Doc. 9) and deny Plaintiff's appeal of the

1

Commissioner's decision (Doc. 1).

## I. Procedural History[1]

Plaintiff protectively filed applications for DIB and SSI on February 28, 2003, alleging disability since January 15, 2003, due to a right shoulder injury, carpal tunnel syndrome, TMJ, and back problems. (R. at 201-03, 229, 515-17.) The Social Security Administration denied Plaintiff's applications initially (R. at 156) and Plaintiff requested a hearing (R. at 160).

A hearing was held before an administrative law judge ("ALJ") on February 9, 2004. (R. at 37-84). Plaintiff (who was not represented by an attorney) and a vocational expert ("VE") testified. (*Id.*) The ALJ issued an unfavorable decision, and the plaintiff requested review from the Appeals Council. (R. at 146-55, 187-91.) On April 28, 2004, the Appeals Council remanded the case to the ALJ and ordered the ALJ to obtain additional evidence of Plaintiff's asthma and testimony from a VE to clarify the effect of Plaintiff's limitations on the occupational base. (R. at 195.)

A second hearing was held before the same ALJ on November 8, 2004. (R. at 26.) Plaintiff (this time represented by an attorney), a medical expert ("ME"), and a VE testified. (R. at 85-139.)[2] On November 23, 2004, the ALJ issued an unfavorable

---

[1] The Background section of this Memorandum, unless otherwise noted, is derived from the Magistrate Judge's Report and Recommendation (Doc. 9).

[2] Plaintiff also filed new applications for DIB and SSI in April 2004. (R. at 17, 195.) In its remand order to the ALJ dated

decision.  (R. at 17-25.)

Plaintiff requested review of the ALJ's decision, and on August 5, 2005, the Appeals Council denied the request for review. (R. at 9-11, 13.)  Thus, the ALJ's decision became the final decision of the Commissioner.  42 U.S.C. § 405(g).  Currently pending is Plaintiff's appeal of the Commissioner's decision. (Doc. 1.)

The Magistrate Judge issued his Report and Recommendation on October 12, 2006.  (Doc. 9.)  Plaintiff filed written objections on October 30, 2006 (Doc. 10), and Defendant filed a response thereto on November 9, 2007 (Doc. 11).  Therefore, this matter is fully briefed and ripe for disposition.

## II. Evidence of Record

The Magistrate Judge thoroughly reviewed the evidence of record.  (Doc. 9 at 4-16.)  We repeat his summary here.

---

April 28, 2004, after noting Plaintiff had filed subsequent claims on April 7, 2004, the Appeals Council stated that its "action with respect to the current claims renders the subsequent claims duplicate.  Therefore, the Administrative Law Judge will associate the claim files and issue a new decision on the associated claims." (R. at 195.)  At the hearing held on November 8, 2004, the ALJ stated that the April 2004 application was being considered with the former application pursuant the Appeals Council's remand order. (R. at 88.)  In the ALJ's November 23, 2004, decision he notes that Plaintiff's 2004 applications were denied initially and the plaintiff requested a hearing on July 23, 2004.  (TR. 17).  As noted by the Magistrate Judge, the record contains no further procedural information regarding the April 2004 applications. (Doc. 9 at 2 n.1.)

The plaintiff was forty-four-years-old, a "younger" individual under the Act, at the time of the ALJ's November 23, 2004 decision. (TR. 18).  20 C.F.R. §§ 404.1563, 416.963. She has fourteen years of education, including high school and two years of college.  (TR. 46-47).  The plaintiff has past relevant work experience as a home maintenance worker.  (TR. 133).

A.  The plaintiff's right rotator cuff injury.

The plaintiff alleged disability since January 15, 2003, the date she stopped working.  (TR. 147, 229).  She reported that she became unable to work due to a right arm injury.  (TR. 229).  On January 14, 2003, the plaintiff fell on the ice and later reported pain and limited range of motion in her right shoulder, and tingling down her right arm. (TR. 169, 280).  A February 21, 2003 MRI showed a full thickness tear of the plaintiff's right rotator cuff and a small moderate effusion.  (TR. 168).  Daniel Feldmann, M.D., an orthopaedic surgeon, diagnosed right shoulder impingement, AC (acromioclavicular) joint degenerative joint disease, and a rotator cuff tear.  (TR. 170). Dr. Feldmann performed surgery to repair the impingement and tear in March 2003.  (TR. 170, 306-07, 330-32).

One week after the surgery, Dr. Feldmann reported that the plaintiff was doing well and had full range of motion at the elbow and wrist.  Dr. Feldmann prescribed physical therapy.  (TR. 304).  Dr. Feldmann reported in May, June, and August of 2003 that the plaintiff was improving, and by August 21, 2003, Dr. Feldmann reported that the plaintiff had full range of motion, normal resistive strength, and negative impingement findings.  (TR. 327-29).  Dr. Feldmann administered an injection to address the plaintiff's biceps tendinitis and recommended she continue her exercises and return in several months.  (TR. 327).

4

Prior to the plaintiff's surgery, Dr. Feldmann noted that the plaintiff was a self-employed housekeeper. (TR. 335). Dr. Feldmann recommended the plaintiff work only part-time, as she was finding it difficult to work full hours with her right shoulder pain. *Id.* Dr. Feldman recommended twenty hours per week of light-duty work. *Id.*

### B. The plaintiff's TMJ.

The plaintiff also alleged disability due to TMJ (temporomandibular joint) disorder, which stemmed from a 1989 car accident in which the plaintiff's face hit the steering wheel. (TR. 229, 269). A June 2002 MRI of the plaintiff's TMJ showed no meniscal displacement, joint effusion, periarticular TMJ inflammatory changes, or edema. (TR. 267). In November 2002, Anil Patil, M.D., noted that although her MRIs were negative, the plaintiff still wore a separator and reported having spasms. (TR. 271).

Due to increased complaints of jaw and knee pain in February 2004, John P. Pagana, M.D., the plaintiff's family practitioner, recommended that the plaintiff increase her pain medication while she was visiting her daughter in Italy. (TR. 439). In October 2004, Reynold M. Crane, D.D.S., recommended that the plaintiff be evaluated by a neurologist for a neurological origin to her pain in light of her jaw complaints and normal MRI. (TR. 493, 503). His examination was remarkable only for a marked muscle tenderness to all her muscles of mastication. (TR. 493). The plaintiff testified that she had gained nearly twenty pounds in the previous year. (TR. 73). She testified that she took her medications before eating, but did not mention pain while eating. (TR. 72-73).

### C. The plaintiff's cervical and lumbar impairments.

The plaintiff alleged disability due to

5

degenerative disc disease of the cervical and lumbar spine, which she also traces to the 1989 car accident. (TR. 229, 271). A 1990 MRI showed degenerative disc disease at C5-6 with a bulge at C5-6 and C6-7, cervical spondylosis, and neural foraminal narrowing at the C5-6 level. (TR. 271). Similarly, a February 20, 2002 cervical MRI showed mild degenerative disc disease at C5-6 with bilateral neural foraminal narrowing and no evidence of cervical cord compression. (TR. 295). In November 2002, the plaintiff complained of tightness in her neck and stated it was reduced with moist heat, rest, massage, and acupuncture. *Id.* An April 2003 cervical spine MRI showed a Chiari I malformation[3], mild left sided C3-4 through C6-7 foraminal stenosis, anterolistheisis (slippage) of C7 under C6 with angular lordosis, and small bulges at C5-6 and C6-7. (TR. 177-178, 337-38).

The plaintiff also complained of tightness in her low back that increased with activity but decreased with massage. *Id.* A February 2002 MRI of the lumbar spine revealed no evidence of disc herniation but low grade central lumbar stenosis at L3-4 and posterior annular tear to the L3-4 and L4-5 disc. *Id.* The physician who interpreted the MRI reported that there was no lumbar radiculopathy. *Id.*

In June 2003, Dr. Pagana described the plaintiff's spinal disorder as "pain with motion" in her cervical and lumbar spine. (TR. 314). Dr. Pagana reported that sitting

---

[3] A Chiari I malformation "occurs during fetal development and is characterized by downward displacement by more than four millimeters of the cerebellar tonsils beneath the foramen magnum into the cervical spinal canal." Many people with Chiari I malformation have no symptoms, although some may have severe head and neck pain, headaches, loss of pain and temperature sensation of the upper torso and arms, loss of muscle strength in the hands and arms, dizziness and balance problems. Chiari Malformation, at Neurosurgery Today, March 2006, at http://www.neurosurgerytoday.org/what/patient_e/chiari1.asp

straight leg raising tests were negative and
that the plaintiff had 4/5 motor power,
noting that she was "weak but not severely
weak." *Id.* Dr. Pagana noted that the
plaintiff's treatment for her cervical and
lumbar pain was pain medication. *Id.*

A September 2003 lumbar spine MRI showed
small disc protrusions at L3-4 and L5-S1, but
no significant canal narrowing. (TR. 176,
360). An October 2003 x-ray of the
plaintiff's lumbar spine showed moderately
severe narrowing of the L2-3 and L3-4 disc
spaces, but was otherwise unremarkable. (TR.
175). W. Fred Hess, M.D., diagnosed lumbar
spondylosis and noted that the plaintiff's
pain appeared "mechanical in nature and
related to degenerative disc disease." Dr.
Hess noted that the plaintiff would start a
back extension and strengthening exercise
program and recommended she return in six to
eight months. (TR. 180).

When the plaintiff returned to Dr. Hess
in April 2004, he recommended she continue
with conservative treatment, including pain
medications and exercises, and told her that
he "really d[id]n't see anything at th[at]
point in time that [he] consider[ed]
surgical." (TR. 451-52). Physical
examination revealed some diffuse tenderness
throughout the trapezial area into the lumbar
spine but negative sciatic notch tenderness,
negative root tension signs, normal gait, and
no focal motor deficits. (TR. 451).

Physical therapy records from November
and December 2003 reveal that the plaintiff
cooked Thanksgiving dinner for ten people,
including all of the cooking and cleaning;
cleaned her house; and was able to shovel a
little snow. (TR. 377-79). The plaintiff
complained of low back pain and thoracic pain
on one occasion after doing a lot of walking,
getting groceries, and lifting bags. (TR.
378). The plaintiff reported in January 2004
that her low back was stronger and she had
increased endurance since starting swimming.
(TR. 377). The plaintiff stopped going to

physical therapy that same month for
insurance reasons.  *Id.*

Physical therapy records from earlier in
2003 also reveal that the plaintiff performed
a variety of daily activities.  The plaintiff
reported "doing a lot of work lifting wood
and other activities at home" in July 2003,
cleaning out cupboards and mowing grass with
a riding mower in June 2003; and "doing a lot
of cleaning' and "making a lot of macaroni
salad" in May 2003.  (TR. 388, 389, 392-93).

### D.  The plaintiff's carpal tunnel syndrome.

An EMG performed in December 2002 to
evaluate the plaintiff's hand complaints
revealed moderately severe right carpal
tunnel syndrome and left ulnar nerve
neuropraxia across the elbow.  (TR. 274, 384-
85).  David C. Bush, M.D., performed a right
carpal tunnel release in April 2003.  (TR.
299-300).  At a follow-up visit five days
later, Dr. Bush noted that the plaintiff was
"doing well".  (TR. 297).  Dr. Bush performed
a left carpal and cubital tunnel release in
September 2003.  (TR. 171-72, 347-38).  At a
follow-up visit with Dr. Bush in November
2003, the plaintiff indicated that she was
"extremely pleased" with the outcome of her
surgery.  (TR. 407).  Dr. Bush noted that she
would be sent for work hardening and physical
therapy.  *Id.*

By August 2004, Sanjiv Naidu, M.D.,
noted that the plaintiff still complained of
a "certain amount of weakness in her left
arm." (TR. 485).  The plaintiff was sent to
Dr. Naidu after she reported dropped things
and having diffuse forearm pain.  *Id.*  The
plaintiff reported that Dr. Bush had told her
the problem was cervical in nature, rather
than related to carpal tunnel syndrome.  *Id.*
Dr. Naidu noted that the plaintiff's left
ulnar nerve was stable and her paresthesias
appeared to be resolved.  *Id.*  The plaintiff
had only mild tenderness over the superficial
branch of the radial nerve and full cervical

range of motion.  (TR. 485).  Dr. Naidu noted
that there was "really no need for further
surgical treatment" and recommended only
exercises. *Id.*[4]

On February 1, 2005, because the
plaintiff continued to complain of numbness
and paresthesias in her upper extremities,
Dr. Pagana referred the plaintiff to Mark A.
Blakeslee, D.O., for a nerve conduction study
in her upper extremities.  (Tr. 535, 542).
Dr. Blakeslee's resulting report noted that
the EMG and nerve conduction study was
abnormal, and was "compatible with the
presence of moderate severity median
mononeuropathy" but showed no evidence of
radiculopathy, myopathy, or an ulnar palsy.
(TR. 535). In July 2005, Dr. Blakeslee
reported to Dr. Pagana that the plantiff had
severe bilateral carpal tunnel syndrome.
(TR. 528).

### E.   The plaintiff's asthma and vision problems.

The Appeals Council remand order
instructed the ALJ to obtain additional
evidence regarding the plaintiff's asthma.
(TR. 193-96).  The plaintiff has been
diagnosed with and takes medication for
asthma.  (TR. 255, 425).  The Appeals Council
specifically noted that the record had
contained insufficient pulmonary function
evidence.  (TR. 194).  In April 2004, a
methacholine challenge test confirmed the
asthma diagnosis.  (TR. 428).  April 2004 and
August 2004 baseline pulmonary function tests
were normal.  (TR. 428, 488).

In an August 2003 letter, Sheldon J.
Kaplan, M.D., a specialist in retina and
vitreal diseases, indicated that the

---

[4]  Plaintiff also visited Dr. Bush on October 12, 2004,
because of problems with her hand.  (R. at 492.)  Dr. Bush stated:
"I think the main problem is very, very mild triggering of the
finger.  One wonders about some sort of an inflammatory problem.
There is not much evidence for this today."  (*Id.*)

plaintiff had a history of a repaired retinal
detachment in the left eye and laser
treatment for lattice degeneration in the
right eye. (TR. 167,341). He further
indicated that her corrected vision was 20/25
in the right eye and 20/60 in the left eye.
(TR. 167). Dr. Kaplan reported that the
plaintiff complained of lost words when
reading, a very large floater, and sparkles
around traffic lights. (Tr. 167). Dr.
Kaplan attributed the plaintiff's inability
to read for extended periods of time to
distorted blank spots in her vision from some
early posterior subcapsular cataracts and
scarring. *Id.* He stated that the plaintiff's
contacts and reading glasses make her vision
better, but not good enough to read for long
periods of time. *Id.*

### F. Medical opinions.

In June 2003, John P. Pagana, M.D., the
plaintiff's family practitioner, indicated
that the plaintiff could perform most daily
activities, but had to modify them due to
pain. (TR. 314). His examination revealed
slightly decreased strength (4/5), and a
decreased range of motion, but normal
reflexes. (Tr. 314-315). Dr. Pagana denied
that the plaintiff used an assistive devise
for ambulation, even for special situations.[5]
(TR. 315).

In September 2003, Dr. Pagana completed
a form for purposes of entitling the
plaintiff to welfare benefits. Dr. Pagana
opined that the plaintiff was "temporarily
disabled - less than twelve months" from
September 30, 2003 through March 30, 2004,
due to discogenic disease and carpal tunnel
syndrome. (TR. 174, 343).

Mohammed Samad, M.D., a state agency

---

[5] Notably, despite Dr. Pagana's assurance that the plaintiff
never required an assistive device for walking, the plaintiff used
a cane at the hearing. (TR. 18).

physician, examined the plaintiff in June
2004.  (TR. 461-62).  The plaintiff reported
that she was unable to walk a block, sit for
one-half hour or lift more than three pounds.
(TR. 461).  A physical examination revealed
that she had restricted range of motion of
the neck, knees, right shoulder, and
lumbosacral spine.  (TR. 463).

Inexplicably, Dr. Samad indicated in one
portion of his report that the plaintiff had
3/5 strength in both hands, but stated she
has 0/5 strength in both hands in another
portion of that same report, in fact, in the
same paragraph.  (TR. 463).  Dr. Samad
completed a medical source statement
indicating that the plaintiff could only lift
two to three pounds occasionally; stand and
walk an hour or less; and sit less than six
hours.  (TR. 465-66).

### G.  The plaintiff's right knee injury.

The plaintiff injured her knee two
months before the second hearing when she
tripped and fell on September 5, 2004.  (TR.
85, 496).  September 2004 x-rays of the
plaintiff's knee were negative.  (TR. 502).
An MRI of the knee showed no significant
change within the substance of the lateral
meniscus, intra-articular effusion, no
chondral effect, and no loose bodies.  (TR.
495).  In October 2004, Dr. Pagana injected
the plaintiff's knee with Kenalog and
Lidocain and instructed her on "icing and
activity modification."  (TR. 495).  He noted
that the plaintiff should return in four
weeks for a follow-up and determine whether
arthroscopy would be needed.  (TR. 495).  The
plaintiff submitted no further relevant
medical records to the Appeals Council,
although the plaintiff submitted other
medical records covering the period from
August 2004 to July 2005.  (TR. 528-59).

### H.  Hearing testimony.

At the February 2004 hearing, the
plaintiff testified that she lives in a home

11

with her eleven year-old daughter and two
boarders. (Tr. 45-46, 64-65). She testified
that she drives locally, including to the
YMCA three times per week to swim. (TR. 46,
61, 64). The plaintiff testified that she
shops for groceries several times per week
because she cannot carry everything at once.
(TR. 64). She cooks meals for herself and
her daughter. (TR. 69).

The plaintiff denied being able to lift
any more than ten pounds. (TR. 68). She is
a leader of a girl scout troop and attends
weekly meetings. (TR. 74).

At the second hearing in November 2004,
the plaintiff was represented by counsel.
(TR. 85-139). She testified that she was
still involved with the Girl Scouts and was
an assistant leader for a troop. (TR. 124).
The plaintiff also testified that her twelve
year-old daughter is very self-sufficient,
including making her own lunch and getting
ready for school. (TR. 122). She states
that her daughter does the laundry and the
cleaning and is learning how to cook. (TR.
131). The plaintiff testified that she takes
her daughter grocery shopping and her
daughter will help her carry the bags. (TR.
132).

A VE also testified. (TR. 133-138).
The ALJ asked the VE to consider the
plaintiff's age, education, and work
experience, as well as the fact that she was
limited to sedentary work with a sit/stand
option. (TR. 143). The ALJ also asked the
VE to consider that Plaintiff would require a
work environment in which she would not be
exposed to excess dust, fumes, odors, gases
or any type of pollutants. *Id.* The ALJ also
added that Plaintiff had visual impairments
that would not require any greater degree of
visual acuity than is needed to drive. (TR.
134-35). Based upon these hypothetical
restrictions, the VE identified sedentary
unskilled positions of video monitor, ticket
taker, and telephone receptionist. (TR.
135).

12

A medical expert, John Tansey, M.D.,
testified at the second hearing (TR. 90).
Dr. Tansey indicated that the plaintiff's MRI
findings of degenerative disc diesase were
not significant but were, instead, normal for
someone forty-five to fifty years old.  (TR.
93).  Dr. Tansey also testified, regarding
the plaintiff's carpal tunnel release, that
the median nerve was not involved in
grasping.  He stated that the plaintiff's
carpal tunnel problems had been sensory
rather than muscular, i.e., pain and numbness
rather than grasping.  (TR. 105-07).

Based on his review of the medical
evidence of record, Dr. Tansey opined that
the plaintiff retained the ability to perform
sedentary work with a sit/stand option,
including lifting up to ten pounds, sitting
at least six hours, pushing/pulling ten
pounds, climbing ramps and stairs, but should
avoid moderate exposure to fumes, odors,
dust, and gases.  (TR.  95-99).

(Doc. 9 at 4-16.)

### III.  Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[6]  It is necessary for the

---

[6]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of
substantial gainful work which exists in the
national economy, regardless of whether such
work exists in the immediate area in which he

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby she qualifies for benefits without further inquiry; 4) whether the claimant can perform her past work; 5) whether the claimant's impairment together with her age, education, and past work experiences preclude her from doing any other sort of work.  20 C.F.R. §§ 416.920(a)-(f); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

The relevant time period for this case is January 15, 2003, the alleged onset date of disability, through November 23, 2004, the date of the ALJ's decision.

The instant decision was ultimately decided at the fifth step

---

lives, or whether a specific job vacancy exists
for him, or whether he would be hired if he
applied for work.

42 U.S.C. § 423(d)(2)(A).

of the process, when the ALJ concluded the plaintiff was not disabled because she could perform work existing in substantial numbers in the national economy.  (R. at 25.)

In his decision, the ALJ identified the following specific findings of fact and conclusions of law:

    1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision and potentially through December 31, 2007 (Exhibit 6D).

    2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

    3.    The claimant has impairments which satisfy the threshold requirements of step two of the sequential evaluation process (20 CFR §§ 404.1520(c) and 416.920(b).

    4.    These medically determinable impairments do not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulations NO. 4.

    5.    The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

    6.    The claimant has the residual functional capacity to lift and carry 10 pounds occasionally and 5 pounds frequently. She can sit, stand and walk 8 hours in an 8-hour workday provided she can sit and stand at her option.  She should avoid exposure to concentrated amounts of dust, fumes, and other respiratory irritants.

7.      The claimant is unable to perform any of
        her past relevant work (20 CFR §§
        404.1565 and 416.965).

8.      The claimant is a "younger individual"
        (20 CFR §§ 404.1563 and 416.963).

9.      The claimant has more than a high school
        education (20 CFR §§ 404.1564 and
        416.964).

10.     The transferability of skills is not an
        issue in this case (20 CFR §§ 404.1568
        and 416.968).

11.     The claimant has the residual functional
        capacity to perform a significant range
        of sedentary work (20 CFR §§ 404.1567
        and 416.967).

12.     Although the claimant's limitations do
        not allow her to perform the full range
        of sedentary work, using Medical-
        Vocational Rule 201.28 as a framework
        for decision-making, there are a
        significant number of jobs in the
        national economy she could perform.
        Examples of such jobs include work as a
        video monitor, ticket taker, and
        telephone receptionist.

13.     The claimant was not under a
        "disability," as defined in the Social
        Security Act, at any time through the
        date of this decision (20 CFR §§
        404.1520(g) and 416.920(g)).

(R. at 24-25.)

### III. Standard of Review

    This Court's review of the Commissioner's final decision is

limited to determining whether there is substantial evidence to

support the Commissioner's decision.   42 U.S.C. § 405(g); *Hartranft

v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).   A reviewing court is

16

"bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Plummer*, 186 F.3d at 427 (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)). Therefore, we will not set aside the Commissioner's final decision if it is supported by substantial evidence, even if we would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  These proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his

17

claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

Finally, the Third Circuit has recognized that it is necessary for the Secretary to analyze all evidence. If he has not done so and has not sufficiently explained the weight he has given to all probative exhibits, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky*, 606 F.2d at 407. In *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981), the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected. "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected

18

is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  Further, the ALJ does not need to use particular language or adhere to a particular format in conducting his analysis.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

Here, Plaintiff raises the same objections to the Magistrate Judge's Report and Recommendation as she initially raised on appeal.  Therefore, inferentially Plaintiff objects to the Report and Recommendation on the basis that the Magistrate Judge's findings on the specific issues raised in her appeal were incorrect.

In Plaintiff's objections to the Report and Recommendation, she sets out five areas where the ALJ erred.  First, she contends the ALJ asked questions that were prejudicial, biased or irrelevant.  (Doc. 10 at 21.)  Second, Plaintiff argues the ALJ misrepresented the evidence of record.  (Doc. 10 at 25.)  Third, Plaintiff argues the ALJ erred in not giving controlling weight to the agency physician.  (Doc. 27 at 41.)  Fourth, Plaintiff maintains the ALJ disregarded the Appeals Council's remand order in

that he did not consider additional evidence at the rehearing. (Doc. 10 at 28.)   Fifth, Plaintiff asserts the ALJ erred in relying on the hearing testimony of the medical examiner.   (Doc. 10 at 30.) In an introductory statement to these specific issues, Plaintiff also states the ALJ erred in finding her not credible.   (Doc. 10 at 20.)

The Magistrate Judge found the ALJ's decision is supported by substantial evidence and recommends denial of Plaintiff's appeal. (Doc. 9.)   In his analysis of the record, the Magistrate Judge specifically found the ALJ did not err regarding the matters set out above.   (*Id.*)   Plaintiff disagrees with the Magistrate Judge's conclusion on this issue and repeats her arguments made in her initial appeal.   (*See* Docs. 9, 10.)   We will now turn to Plaintiff's specific objections.

## A.   *ALJ Hearing Questions*

Plaintiff first contends the ALJ asked questions that were prejudicial, biased, irrelevant and sexist.   (Doc. 10 at 21.) After thoroughly reviewing the hearing testimony (R. at 37-139), we conclude this objection is without merit.

While the necessity to develop the record may at times lead to questions a claimant finds uncomfortable, the ALJ must ask probing questions to fulfill his duty of ascertaining whether a claimant is under a disability as defined in the Act.   As the Magistrate Judge discussed, in accordance with the regulations, this inquiry goes beyond strictly medical questions.   (*See* Doc. 9 at 18-19.)   Here

the ALJ's questions about Plaintiff's education, work history, family background and living situation were within the bounds of acceptable inquiry.  As the Magistrate Judge pointed out, because Plaintiff was not represented by counsel at the first hearing, the ALJ himself was obligated to ask questions that a claimant's attorney may ordinarily ask.  (*See* Doc. 9 at 19.)  Although, as Plaintiff contends, some questions may have been unnecessary, the process of eliciting the required information is not an exact science and we find no error.

**B.    *Representation of the Evidence of Record***

Plaintiff asserts the ALJ "incorporated misrepresentations of the evidence and testimony, and made lay medical judgments based on personal bias." (Doc. 10 at 25.)

The law is clear that an ALJ may not base his decision on his own opinion - his lay medical judgment. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted).  However, an ALJ is charged with considering contradictory evidence and explaining his decision as to what evidence he credited.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).

Plaintiff cites four errors in connection with her assertion that the ALJ improperly considered the evidence. First, she states that she had been complaining of carpal tunnel symptoms, back pain, visual problems, and asthma for years and had not been working for over a year before the first hearing in February 2004.  (*Id.*)

21

Plaintiff's argument  points to her carpal tunnel, knee and
pulmonary problems - citing to evidence she finds supportive of a
finding that these impairments would last more than twelve months
as required by the Act.  (Doc. 10 at 25-27.)

The Magistrate Judge carefully reviewed the evidence of record
concerning Plaintiff's carpal tunnel syndrome.  (Doc. 9 at 21-23.)
He concluded the ALJ's determination that this condition was not of
sufficient severity for the required twelve month time period was
supported by substantial evidence.  (Doc. 9 at 22.)  He further
concluded that Plaintiff's reliance on new evidence (evidence
presented to the Appeals Council after the ALJ's November 23, 2004,
decision) is misplaced because it is not evidence which requires
remand.  (*Id.*)  We agree.

In his February 2004 decision, the ALJ noted that Plaintiff
"underwent bilateral carpal tunnel release and post surgical notes
indicate the claimant's recovery is good." (R. at 151.)  In the
ALJ's November 23, 2004, opinion, he relied on the reports of Drs.
Naidu and Bush in finding that Plaintiff's carpal tunnel problems
had resolved within twelve months.  (R. at 21.)

The record supports the ALJ's reliance in that Dr. Bush, the
orthopaedic surgeon who performed the carpal tunnel surgery on
September 30, 2003, noted "nerves are working well" in Plaintiff's
post-op visit on October 8, 2003.  (R. at 345.)  On May 11, 2004,
Dr. Bush reviewed Plaintiff's symptoms of weakness in the arm and
numbness in the palm, and suggested that her symptoms were of a

different origin than that addressed by his September surgical intervention.  (R. at 445.)  On August 10, 2004, Plaintiff was seen for follow-up of treatment of her left arm weakness by Dr. Naidu. (R. at 485.)  He noted that Plaintiff was told by Dr. Bush that the left arm weakness "was something going on in with the neck."  (R. at 485.)  He found tenderness over the radial tunnel and mild tenderness over the superficial branch of the radial nerve.  (*Id.*) Dr. Naidu recommended physical therapy, concluding further surgical treatment was not necessary, with the notation that "[i]f anything she should be following up with the Pain Clinic."  (*Id.*)  On October 12, 2004, Plaintiff again saw Dr. Bush because of problems with her hand.  (R. at 492.)  Dr. Bush stated: "I think the main problem is very, very mild triggering of the finger.  One wonders about some sort of an inflammatory problem.  There is not much evidence for this today."  (*Id.*)  Importantly, neither Dr. Bush nor Dr. Naidu opined that Plaintiff had recurrent carpal tunnel syndrome.

Plaintiff does not develop her different reading of Dr. Naidu's August 10, 2004, report.  (Doc. 10 at 25.)  She bases her objection to the ALJ's finding regarding her carpal tunnel problems primarily on Dr. Blakeslee's nerve conduction tests (performed on February 1, 2005 (R. at 535)). (Doc. 10 at 25-26.)  The problem with this reliance is that this report was not before the ALJ. (*See* R. at 533.)  Rather, it was sent to the Appeals Council on April 21, 2005, (*id.*) well after the ALJ issued his decision on

November 23, 2004.

As noted above, evidence not before the ALJ cannot be considered when determining whether the ALJ's decision was based on substantial evidence. *Matthews*, 239 F.3d at 593-95. Evidence sent to the Appeals Council in support of a request for a review of an ALJ's decision is not evidence that was before the ALJ for purposes of a reviewing court's substantial evidence determination. *Id.*

Because Dr. Blakeslee's February 2005 report cannot be considered contradictory to Dr. Naidu's and Dr. Bush's reports and because the latter reports support the ALJ's finding regarding the severity and duration of Plaintiff's carpal tunnel problems, we conclude the ALJ's decision on this matter is supported by substantial evidence.

In the context of the District Court's review of the Commissioner's decision, the role of new evidence – evidence presented to the Appeals Council but not before the ALJ – is addressed by the Third Circuit Court of Appeals in *Matthews*, 239 F.3d at 594. *Matthews* held that when new evidence is presented to the Appeals Council that was not before the ALJ, the district court could remand the matter to the ALJ only if the evidence is new and material and there was good cause shown for the evidence not to have been presented to the ALJ. *Id.* The court made clear that remand for new evidence is not a light matter. *Id.* at 595.

Here Plaintiff does not argue that the new evidence presented to the Appeals Council following the ALJ's November 23, 2004,

24

decision meets the *Matthews* standard for remand.  (*See* Doc. 10.)
This is Plaintiff's burden.

This deficiency notwithstanding, we have considered whether
Dr. Blakeslee's reports meet the *Matthews* requirements and conclude
they do not.  The evidence is new because it was not submitted
before the date of the ALJ's decision.   Because Dr. Blakeslee saw
Plaintiff after the ALJ issued his decision, good cause existed for
not presenting the evidence to the ALJ.   However, Plaintiff's new
evidence fails on the materiality prong of the inquiry.

"An implicit materiality requirement is that the new evidence
relate to the time period for which benefits were denied, and that
it not concern evidence of a later-acquired disability or of the
subsequent deterioration of the previously non-disabling
condition."  *Szubak v. Sec'y of Health and Human Services*, 745 F.2d
831, 833 (3d Cir. 1984).

Here Dr. Blakeslee's reports suggest a worsening of
Plaintiff's carpal tunnel syndrome when compared with Dr. Naidu's
and Dr. Bush's reports in the previous year - reports based on
direct evaluation of Plaintiff's condition as late as approximately
one month before the ALJ's decision (*see*, *e.g.*, R. at 492).
Therefore, the evidence indicates this is a situation where there
is a "subsequent deterioration of the previously non-disabling
condition," *Szubak*, 745 F.2d at 833 and is not material to the
time period considered by the ALJ.

25

As Defendant points out, the fact that Plaintiff continued to experience symptoms is not the issue, rather "the issue is whether [Plaintiff] experienced residual limitations requiring work restrictions as a result of this condition." (Doc. 11 at 5.) Defendant also makes the important observation that "i[f] Plaintiff believes that new evidence shows that she is disabled after the date of the ALJ's decision, her remedy is to file a new application, not to seek to overturn a decision in her previous application that was correct at the time it was rendered." (Doc. 11 at 5 (*citing* 20 C.F.R. §§ 404.620(a)(2), 416.330(b)).)

Plaintiff also argues the ALJ erred in not finding that her knee injury met the durational requirement of the Act. (Doc. 10 at 26.)  The Magistrate Judge correctly concluded that Plaintiff had not met her burden of presenting evidence indicating her knee injury was expected to last more than twelve months. (Doc. 9 at 24.)  In her objections, Plaintiff cites only to Dr. Batman's report stating that the last entry in the record regarding her knee injury "refers to Dr. Batman's decision to consider arthroscopic surgery, and the recovery period would be beyond a twelve month period from date of onset." (Doc. 10 at 26.)  Plaintiff argues "it could be concluded" from this evidence that her disability based on her knee injury would last more than a twelve month period. (*Id.* at 26-27.)

Dr. Batman's report, dated October 4, 2004, indicates that he

planned to get an MRI of her knee and "[i]f a tear is found, she
will be a candidate for arthroscopic surgery; if not, consider
corticosteroid treatment." (R. at 496.) It is Plaintiff's
assertion, not Dr. Batman's opinion, that the recovery period from
such surgery would be beyond twelve months from the date of her
injury. (*See id.*) Moreover, as Plaintiff admits, the record
contains no further evidence regarding her knee injury. (Doc. 10
at 26.) When Plaintiff submitted additional evidence to the
Appeals Council - medical evidence dating as late as July 5, 2005
(*see* R. at 12) - she did not submit any evidence regarding her knee
injury. Therefore, in this context, the ALJ's surmising that
Plaintiff's knee injury would not last more than one year is not
error.

Plaintiff's argument regarding the ALJ's consideration of her
asthma is also without merit. Plaintiff's argument does not point
to specific medical evidence or cite the record at all. (*See* Doc.
10 at 27.) The record contains evidence the ALJ considered the
limiting effects of Plaintiff's asthmatic condition in making his
disability determination: he found that in her sedentary work
Plaintiff "should avoid exposure to concentrated amounts of dust,
fumes, and other respiratory irritants." (R. at 24.) Plaintiff
does not point to any evidence to support her inference that her
asthma was a condition that prevented her from engaging in
substantial gainful activity - a key element of a disability

determination under the Act.  *See* 42 U.S.C. §§  423(d)(2)(A).

**C.   *Agency Physician Opinion***

Plaintiff next argues the ALJ erred in not giving controlling weight to the agency physician, Dr. Samad, because it is supported by evidence of record.  (Doc. 10 at 27.)  Plaintiff generally asserts that even without the evidence of Dr. Samad, "[t]he ALJ . . . should have found evidence for the Plaintiff's claim to conclude favorably."  (R. at 27.)

As the reviewing Court, our inquiry is whether the ALJ's decision was supported by substantial evidence, not whether evidence supports an individual doctor's opinion or whether the record would support a finding contrary to that of the ALJ.  *See*, *e.g.*, *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citations omitted).

The Magistrate Judge carefully reviewed Plaintiff's objection. (Doc. 9 at 25-27.)  Most notably, he compared Dr. Samad's opinion with that of Plaintiff's treating physicians.

> Dr. Samad opined that the plaintiff was significantly more limited in her functioning than any of her own physicians indicated.  In fact, the only opinions of disability the plaintiff provided in support of her claim consisted of opinions that would not satisfy the standard of the Act.  Dr. Pagana's opinion that the plaintiff was "temporarily disabled" for six months ending in March 2004 does not satisfy the durational requirement of the Act.  (TR. 174, 343).  *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) (setting out the twelve month duration requirement). Likewise, Dr. Feldman's opinion that the

> plaintiff could only perform her past work as
> a housekeeper part-time until her shoulder
> problems were corrected does not suggest that
> she is incapable of performing all work, only
> her past work.  (TR. 335).  Significantly,
> Dr. Feldmann did not offer another opinion of
> disability after the plaintiff's shoulder
> surgery.  Finally, as the ALJ also pointed
> out, Dr. Samad's restrictions appear to be
> based on the plaintiff's subjective
> complaints.  (TR. 22).

(Doc. 9 at 26-27.)

The Magistrate Judge's discussion of this issue is consistent with the evidence of record.  As he concluded, the record contains substantial evidence to support the ALJ's decision not to give controlling weight to Dr. Samad's opinion.  Therefore, we conclude Plaintiff's argument to the contrary is without merit.

**D.   *Appeals Council's Remand Order***

Plaintiff asserts the ALJ disregarded the Appeals Council's remand order in that he did not consider additional evidence at the rehearing.  (Doc. 10 at 28.)  With this objection, Plaintiff maintains the ALJ did not properly consider the pulmonary function test and did not adhere to the Vocational Expert's advice.  (*Id.* at 28-29.)

The record indicates that the ALJ adhered to the Appeals Council's remand order regarding Plaintiff's asthma (R. at 195) in that he considered evidence of Plaintiff's asthma as directed (R. at 18-19, 21, 22, 24.)  As discussed above, the ALJ included asthma-related limitations in his Findings of Fact and Conclusions of Law.  (R. at 24.)

The ALJ also complied with the remand order to obtain and consider supplemental evidence from a vocational expert (R. at 195) in that he took additional evidence from a VE at the hearing held on November 8, 2004, and considered the evidence in making his determination (R. at 23-24, 133).  Plaintiff specifically states "the ALJ asked the vocational expert on three separate occasions if even sedentary work would effect [sic] the Plaintiff negatively, and the VE replied that it would." (Doc. 10 at 29.)  Plaintiff then cites to hypothetical questions posed to the VE.  (*Id.* at 29-30 (citing R. at 82, 83, 137).)

Importantly, the hypotheticals cited asked the VE to assume that the ALJ accepted Plaintiff's testimony with regard to her limitations, pain and effect of medications.  (R. at 82, 83, 137.) Because the ALJ found Plaintiff's allegations of her limitations not totally credible (R. at 22, 24, 150, 154), it is logically consistent that the VE testimony upon which he relied is not that cited by Plaintiff.  (See R. at 24, 154.)  Rather, the ALJ relied on the VE's answers to hypothetical questions other than those assuming that Plaintiff was totally credible.  (*See*, *e.g.*, R. at 134-35.)  Therefore, the record reveals that the ALJ's consideration of the VE's testimony is consistent with the Appeals Council's remand order and Plaintiff's objection to the contrary is without merit.

**E.   *Medical Examiner's Testimony***

Plaintiff alleges the ALJ erred in relying on the hearing

testimony of the medical examiner, Dr. Tansey, for several reasons. (Doc. 10 at 30.)  First, Plaintiff asserts Dr. Tansey wrongly stated that Plaintiff's disc disease "was common per her objective MRI reports to be equal to someone of 45-50 years of age." (*Id.* (*citing* R. at 93).)

Assuming *arguendo* Dr. Tansey's statement that Plaintiff had MRI findings of degenerative disc disease common in those over 45 or 50 (R. at 93) is not completely accurate, we conclude it does not undermine the ALJ's consideration of his testimony generally. Dr. Tansey stated specifically why, upon his review of the record, he concluded Plaintiff did not meet or equal the listing for impairments of the spine: she does not have a herniated disc; she does not have any nerve root impingements; she does not have any muscular weakness in either upper or lower extremities; she has no sensory changes; and she has no reflex changes.  (R. at 92-93.) Plaintiff does not refute these specific findings made by Dr. Tansey.  Therefore, the evidence shows that Plaintiff's one claimed error regarding Dr. Tansey's testimony of Plaintiff's back problems does not undermine his overall testimony or render the ALJ's consideration of his opinion on this matter in error.

Plaintiff also argues Dr. Tansey's testimony about her carpal tunnel syndrome is flawed, inferring he did not properly evaluate the seriousness of the condition in her case.  (Doc. 10 at 30-31.) Among other things, Plaintiff posits Dr. Tansey should have been aware of Dr. Blakeslee's finding that Plaintiff's carpal tunnel

31

surgery had failed.  (*Id.* at 31.)

   As discussed above, Dr. Blakeslee's reports post-dated the ALJ's decision.  The hearing at which Dr. Tansey testified also predated Dr. Blakeslee's opinions - they were not part of the record reviewed by Dr. Tansey.  (*See* R. at 528-30, 535-49.) Therefore, it was not error for Dr. Tansey not to consider Dr. Blakesless's report.

   Finally, we also conclude Plaintiff's assertion regarding Dr. Tansey's lack of expertise concerning some of Plaintiff's medical problems (Doc. 10 at 30, 33) does not render the ALJ's consideration of his opinion error.  As an orthopaedic surgeon, Dr. Tansey had expertise in the area where Plaintiff's main complaints were focused.  In the areas where Dr. Tansey did not have expertise, including opthamology and pulmonology, he offered an opinion as to evidence of record.  (R. at 103-05.)  As Plaintiff recognizes, a physician should be well versed in these areas of medicine based on his general training.  (Doc. 10 at 33.) Therefore, Dr. Tansey's limited review of Plaintiff's visual and asthma problems were appropriate given a physician's general training.  (R. at 103-05.)  More importantly, a review of the ALJ's discussion of the medical evidence reveals that he adequately discussed the evidence of Plaintiff's visual and asthmatic problems and considered these problems in his decision.  (R. at 21, 22, 23, 24.)

**F.   *Plaintiff's Credibility***

   Plaintiff objects to the ALJ's finding regarding her

credibility only in an introductory statement preceding the specific objections discussed above.  (Doc. 10 at 20.)  Plaintiff does not elaborate upon her assertion that the ALJ erred in "finding her not credible" (*id.*).

First, we note the ALJ did not find that Plaintiff was not credible.  Rather, he found Plaintiff's subjective complaints and limitations were "overstated" (R. at 150), and "not entirely supported by the medical evidence" (R. at 22).

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  Pursuant to Social Security Ruling 96-7p, the ALJ must give specific reasons for the weight given to the claimant's statements.  "Where . . . the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to great deference." *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 2001).

Here the ALJ gave specific reasons for his credibility findings. (R. at 22, 150-51.)  We have no basis upon which to deny the deference ordinarily due an ALJ in the matter of credibility.

## V. Conclusion

For the reasons discussed above, we find Plaintiff's objections without merit and conclude the Magistrate Judge did not err in concluding the ALJ's decision was based on substantial

evidence.   Therefore, we adopt the Magistrate Judge's Report and Recommendation (Doc. 9) and deny Plaintiff's appeal (Doc. 1).   An appropriate Order follows.

                         S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge


DATED: March 26, 2007_____

34

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
EDITH M. RIPPLE-WHARY,          :
                                :CIVIL ACTION NO. 3:05-CV-2034
          Plaintiff,            :
                                :(JUDGE CONABOY)
          v.                    :(Magistrate Judge Mannion)
                                :
MICHAEL ASTRUE, Commissioner    :
of Social Security,             :
                                :
          Defendant.            :
```
_____

**ORDER**

AND NOW, THIS 26th DAY OF MARCH 2007, FOR THE REASONS DISCUSSED IN THE ACCOMPANYING MEMORANDUM, IT IS HEREBY ORDERED THAT:

1.   The Magistrate Judge's Report and Recommendation (Doc. 9) is ADOPTED;

2.   Plaintiff's appeal of the Commissioner's decision (Doc. 1) is DENIED;

3.   The Clerk of Court is directed to close this case.


                         S/Richard P. Conaboy
                         RICHARD P. CONABOY
                         United States District Judge